UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
OMAY FORD,                      )
        Petitioner             )
                               )  CIVIL ACTION
        v.                     )  NO.  05-10431-JLT
                               )
UNITED STATES OF AMERICA,      )
        Respondent             )
                               )
```

**Government's Memorandum In Opposition To
Petitioner's Motion Under 28 U.S.C. §2255**

<u>**Introduction**</u>

The United States of America, by Michael J. Sullivan, United

States Attorney, and Michael J. Pelgro, Assistant U.S. Attorney,

hereby files this memorandum in opposition to the petitioner's

motion under 28 U.S.C. § 2255.  As set forth more fully below,

the petitioner's motion should be denied without an evidentiary

hearing because the petitioner's conclusory allegations are not

supported by any specific facts and are refuted by the record in

the underlying criminal case.  Moreover, neither his claim under

<u>United States v. Booker</u>, ___ U.S. ___, 125 S.Ct. 738 (2005), nor

his novel argument that he should be allowed to hold this motion

in abeyance for any and all future claims, is cognizable under §

2255.

**Background And Procedural Posture**[1]

<u>The offenses and the indictment</u>

Petitioner Omay Ford ("Ford") was arrested on July 12, 2001 after he distributed 347.7 grams of crack cocaine to his co-defendant, Curtis Strickland ("Strickland"), who in turn intended to deliver that amount to a Drug Enforcement Administration ("DEA") cooperating witness ("CW"). [PSR ¶¶5,7-9]. The CW and Strickland had previously agreed that Strickland would sell the CW a kilogram of crack cocaine, to be delivered in two batches. [PSR ¶4]. In July 2001, the Court (USMJ Collings) appointed Attorney Lois Lewis ("Lewis") to represent Ford. [Docket entries 4 and 20]. On October 3, 2001, Ford was charged in a two-count indictment with conspiring to distribute cocaine base, in violation of 21 U.S.C. §846, and distribution of cocaine base, in violation of 21 U.S.C. §841(a)(1). [DE 21]. Both counts of the indictment explicitly alleged that the crime charged involved 50 grams or more of crack cocaine and that the 10-year mandatory minimum set out in 21 U.S.C. §841(b)(1)(A)(iii) applied.

<u>Ford's plea agreement and guilty plea</u>

On January 24, 2002, Ford pleaded guilty to the indictment pursuant to a written plea and cooperation agreement with the

---

[1] The facts and procedural history set forth herein are taken from the docket entries ("DE"), the Presentence Report ("PSR"), the transcript of the Rule 11 hearing ("Rule 11 Tr.")(attached as Exhibit A), and the transcript of the sentencing hearing ("ST")(attached as Exhibit B) in the underlying criminal case.

government.  The agreement stated that "Counts One and Two of the Indictment involved 50 grams or more of cocaine base also called 'crack' cocaine," and that a minimum mandatory of 10 years in prison, and a maximum of life in prison, applied.[2]  In the plea agreement, Ford explicitly acknowledged that he was "satisfied" with his legal representation.  At the time of the plea, Ford stated under oath that he was aware of the nature of the charges, that he was aware of his constitutional rights, and that he was pleading guilty knowingly, freely, and voluntarily. [Rule 11 Tr. 2-8].  The  government explained that Ford was arrested after he was seen transferring 347 grams of crack cocaine to Strickland. [Rule 11 Tr. 8-9].

Ford's Presentence Report

The PSR determined that Ford should be held responsible for distributing 347.7 grams on July 12, 2001, the amount that he was seen transferring to Strickland. [PSR ¶5].  It also determined that he should be held responsible for distributing an additional 386.7 grams of cocaine base to Strickland during the course of five prior transactions described by Strickland, totaling 734.4 grams of cocaine base.  [PSR ¶¶3,9].  This drug amount yielded a Base Offense Level ("BOL") of 36.  [PSR ¶15].  With a three-level reduction for acceptance of responsibility, the PSR determined that

---

[2]A copy of the signed plea agreement was attached to the PSR in the criminal case.

Ford's Total Offense Level ("TOL") was 33.  [PSR ¶22].  By virtue of his extensive criminal history, Ford fell into criminal history category ("CHC") VI with 13 criminal history points.  [PSR ¶37].  Ford's Guideline Sentencing Range ("GSR"), therefore, was 235 to 293 months.

The PSR further determined, however, that Ford was a career offender under U.S.S.G. §4B1.1 and that this determination trumped the above GSR.  This designation was based on Ford's three career-offender predicate convictions: (1) distribution of cocaine in 1994; (2) distribution of cocaine in 1995; and (3) assault and battery by means of a dangerous weapon in 2000.  [PSR ¶¶ 29-31,38-39].[3]  The PSR determined that Ford's career offender TOL (with the reduction for acceptance of responsibility) was 34 and that his GSR was 262 to 327 months. [PSR ¶¶38-39, 92].

Attorney Lewis filed nine written objections to the PSR on Ford's behalf.[4]  While she admitted Ford's involvement in the offenses of conviction, she claimed that Ford should not be held responsible for more than the 347.7 grams involved in the offenses of conviction [Objection #1 and #2], and that his non-career

---

[3]Two other career-offender predicate convictions, one for possession of heroin with intent to distribute in 1990 and one for possession of marijuana with intent to distribute in 1990, were not counted due to the Guidelines' timing mechanisms. [PSR ¶¶ 27-28].

[4]Ford's objections are set forth in an Addendum to the PSR.

offender BOL should be 34.  [Objection #4 and #5].  Lewis also argued that Ford should get a downward departure based on his "extraordinary" acceptance of responsibility. [Objection #3].  On April 17, 2002, Lewis followed these objections with a sentencing memorandum and motion for departure in which she

argued, among other things, that Ford should only be responsible for the July transaction; that he should not be considered a career offender because that status, in her view, overstated Ford's criminal history; that the government committed sentencing factor manipulation by buying increasing quantities from Strickland, until it arranged to buy the 347.7 grams that Ford delivered to Strickland; that the totality of circumstances

warranted departure; and that the Court should sentence Ford only to 36 months in prison.  [DE 48].


Ford's sentencing hearing.

On April 24, 2002, the Court conducted Ford's sentencing hearing.  Two central topics at the hearing were Ford's career offender status and the drug amount attributable to Ford.  With respect to the former issue, the Court essentially agreed with the argument made by Lewis in her sentencing memorandum and decided to "eliminate" the issue by not applying the career offender guideline.  [ST 2-8,15] ("So I want to eliminate the career

criminal aspect of this because I don't think he is a particularly strong career criminal."). The Court then turned its attention to determining the attributable drug amount. Again, it agreed with Lewis and found that it would hold Ford responsible only for the amount that Ford distributed to Strickland on the day of his arrest [ST: 8-14]. This resulted in a BOL of 34 (150-500 grams of cocaine base). With a three-level adjustment for acceptance of responsibility, Ford's TOL was 31. His GSR, based on a CHC of VI, was 188 to 235 months'imprisonment. [ST 13-16].

After the Court agreed with Lewis that the GSR was 188 to 235 months, rather than 262-327 months, as determined by the Probation Department and the government, the Court turned its attention to the government's previously-filed motion for a downward departure based on substantial assistance. [DE 50]. Believing that the Probation Department's calculation was correct, government counsel initially recommended a sentence of 180 months' imprisonment, stating that this was a 30% reduction from the low end of that GSR. [ST 2-3, 13]. Lewis asserted that the Court should depart even further downward, arguing that in choosing a sentence, the Court should consider the "tremendous disparity in terms of sentencing for cocaine base and cocaine powder," [ST 17], and also claimed that the DEA case agent believed that Ford should not receive a sentence in excess of 5 to 10 years. [ST 17]. After considering the defense arguments and the solicited views of the case agent

(who was in the courtroom), and after hearing from Ford, the Court imposed a sentence of 120 months' imprisonment, which it determined would be more than a 30% reduction from the low-end of the lower GSR determined by the Court. [ST: 22]. The advocacy of Attorney Lewis thus achieved for Ford a sentence that was five years lower than that recommended by the government.

<u>Ford's Direct Appeal</u>

Ford timely filed a notice of appeal from the Court's sentence. [DE 52]. In his direct appeal, Ford made a variety of claims, including the contention that Lewis had been ineffective for failing to apprise him that he would be held responsible for the quantity of drugs which he provided to Strickland on July 12, 2001. On March 5, 2004, the Court of Appeals summarily affirmed this Court's Judgment and mandate was issued on March 29, 2004. [DE 75]. In so doing, the Court rejected Ford's claim of ineffective assistance, observing that the "indictment, his plea agreement, and his own admission at sentencing all indicated his responsibility for 347.7 grams of cocaine base."

<u>**Argument**</u>

**I.   The Court Should Deny Ford's Petition Without Conducting An Evidentiary Hearing.**

Ford bears the burden of demonstrating, by a preponderance of evidence, not only that he is entitled to relief under 28 U.S.C. §2255, but also that he is entitled to an evidentiary hearing.

<u>Barrett v. United States</u>, 965 F.2d 1184, 1186 (1st Cir. 1992);
<u>United States v. McGill</u>, 11 F.3d 223, 225 (1st Cir. 1993); <u>Cody v.
United States</u>, 249 F.3d 47, 54 (1st Cir. 2001).  An
evidentiary hearing is unnecessary when a §2255 petition "is
inadequate on its face" or, "although facially adequate [,] is
conclusively refuted as to the alleged facts by the files and
records of the case." <u>McGill</u>, 11 F.3d at 226. *See also* <u>Lema v.
United States</u>, 987 F.2d 48, 51 (1st Cir. 1993) (accord); <u>Barrett</u>,
965 F.2d at 1186 (accord).  A petitioner is not entitled to an

evidentiary hearing where his allegations "cannot be accepted as
true because 'they are contradicted by the record, inherently
incredible, or conclusions rather than statements of fact.'"
<u>Murchu v. United States</u>, 926 F.2d 50, 57 (1st Cir. 1991) (citation
omitted); <u>McGill</u>, 11 F.3d at 226 (accord), or where they "amount to
mere 'bald' assertions without sufficiently particular and
supportive allegations of fact," <u>Barrett</u>, 965 F.2d at 1186.

> A district court may dismiss a
> section 2255 petition without
> holding an evidentiary hearing if
> it plainly appears on the face
> of the pleadings that the
> petitioner is not entitled to the
> requested relief, or if the
> allegations, although adequate on
> their face, consist of no more than
> conclusory prognostications and
> perfervid rhetoric, or if the key
> factual averments on which the
> petition depends are either
> inherently improbable or

8

> contradicted by established facts
> of record.

United States v. LaBonte, 70 F.3d 1396, 1412-13 (1st Cir. 1995). The trial judge, moreover, "is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." McGill, 11 F.3d at 225. See also Cohen v. United States, 1997 WL 305222 at *2 (D. Mass. 1997) (Young, CJ) (accord); Indelicato v. United States, 106 F. Supp. 2d 151, 154 (D. Mass. 2000) (Saris, J) (accord).

In this case, no evidentiary hearing is required. Ford's one-sentence claim that Lewis was deficient at sentencing is conclusively refuted by the PSR, the objections to the PSR and sentencing memorandum filed by Lewis, and the arguments made by Lewis at Ford's sentencing hearing. These record materials clearly demonstrate that Lewis was not constitutionally ineffective in her representation of Lewis before this Court.

## II. Ford's Claim That Lewis's Failed To Argue Correctly His Criminal History And To File Proper Objections To The PSR Is Contradicted By The Record And Is Without Merit.

### Legal Standards

Under the well-known test enunciated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), in order to prevail, Ford must establish (1) that "counsel's performance was deficient....that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that the deficient performance

9

prejudiced the defense...that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687. *See also* Bucuvalas v. United States, 98 F.3d 652, 658 (1st Cir. 1996) (observing that a defendant's burden of proving both prongs of the Strickland test is "heavy").

Under the first prong, Ford must demonstrate that Lewis's representation "fell below an objective standard of reasonableness." Id. at 687-88. *See also* Murchu, 926 F.2d at 58 (accord). Since there is a wide range of professionally competent representation, since there are an infinite number of situations in which counsel must make strategy decisions, and since defendants are often tempted to second-guess counsel's assistance after an adverse result, judicial scrutiny of trial counsel's performance "must be highly deferential" and "a court must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689. *See also* Matthews v. Rakiey, 54 F.3d 908, 916 (1st Cir. 1995) (accord); Ouber v. Guarino, 158 F. Supp. 2d 135, 148 (D. Mass. 2001) (observing that habeas court "owes a high degree of deference to the judgment exercised and decisions made by counsel" and that habeas review "is not an occasion for judicial second-guessing of informed

judgments").

Applying the <u>Strickland</u> standard, the First Circuit has emphasized that "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the circumstances then obtaining." <u>United States v. Natanel</u>, 938 F.2d 302, 309-10 (1st Cir. 1991); <u>Lema</u>, 987 F.2d at 51 (accord); <u>Arizaga v. United States</u>, 130 F. Supp. 2d 335, 338 (D. P.R. 2001) (accord).

> Under *Strickland v. Washington*,
> ...counsel is not incompetent merely because
> he may not be perfect.  In real life, there
> is room not only for differences in judgment
> but even for mistakes, which are almost
> inevitable in a trial setting, so long as
> their
> quality or quantity do not mark out counsel
> as incompetent.

<u>Arroyo v. United States</u>, 195 F.3d 54, 55 (1st Cir. 1999).  *See also* <u>McGill</u>, 11 F.3d at 227 ("To avoid the shoals of ineffective assistance, an attorney's judgment need not necessarily be right, so long as it is reasonable.")' <u>Tavares v. United States</u>, 230 F. Supp. 2d 126, 132 (D. Mass. 2001) (Bowler, MJ) (observing that the Sixth Amendment "guarantees proficient as opposed to perfect representation") (*citing* <u>Prou</u>, 199 F.3d at 48.)

Like the Supreme Court, the First Circuit has emphasized that the performance standard "is to be applied not in hindsight, but based on what the lawyer knew, or should have known, at the time

11

his tactical choices were made and implemented." <u>Natanel</u>, 938 F.2d

at 309. *See also* <u>Lema</u>, 987 F.2d at 51 (observing that habeas court

must evaluate the challenged conduct "from counsel's perspective at

the time" and must make every effort "to eliminate the distorting

effects

of hindsight"); <u>Matthews</u>, 54 F.3d at 917 (that counsel's trial

strategy "was not ultimately a winning strategy is of no moment in

assessing its reasonableness of [the] case, viewed as of the

time of counsel's conduct, counsel's performance was reasonable").

> [T]actical decisions, whether wise or
> unwise, successful or unsuccessful, cannot
> ordinarily form the basis of a claim of
> ineffective assistance... Only where a
> defense decision is completely unreasonable,
> not merely wrong, so that it bears no   relat
>                                         ionsh
>                                         ip to
>                                         a
>                                         possi
>                                         ble
> defense strategy, is further review
> into counsel's competence required.

<u>United States v. Ortiz Oliveras</u>, 717 F.2d 1, 3-4 (1st Cir. 1983).

*See also* <u>Barrett</u>, 965 F.2d at 1193 (habeas petitioner must

demonstrate that counsel's error "clearly resulted from neglect or

ignorance rather than from informed, professional judgment" and

"strategic choices made after thorough investigation of law and

facts relevant to plausible options are virtually

unchallengeable").

Under the second prong of the <u>Strickland</u> test, Ford must

affirmatively prove prejudice, i.e., that his attorney's errors "actually had an adverse effect on the defense" and not merely that they "had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693.

> The defendant must show that there is a
> reasonable probability that, but for
> counsel's unprofessional errors, the result
> of the proceeding would have been different.
> A reasonable probability is a probability
> sufficient to
> undermine confidence in the outcome.

Strickland, 466 U.S. at 694. *See also* Matthews, 54 F.3d at 916 (accord). Focusing on this prong, the First Circuit has stated:

> On one end, it is not enough to show that the
> errors had "some conceivable effect on the
> outcome." Nor is it required, however, that
> the defendant prove that the errors
> made were more likely than not to have
> affected the verdict. It is important to maintain the
> focus of an ineffectiveness inquiry on the "fundamental
> fairness of the proceeding."

Gonzalez-Soberal v. United States, 244 F.3d 273, 278 (1st Cir. 2001).

### Lewis' Performance At Sentencing Was Not Ineffective

At the Court aptly pointed out at the sentencing hearing, the issue in a case like this one, in which the government filed a substantial-assistance motion, is "where do you start?" [ST 5]. In other words, what is the GSR from which a cooperating defendant such as Ford is getting a reduction? In Ford's case, it is crystal clear that Ford was a career offender and that his GSR was 262-327 months. The low end of that GSR – 262 months –

13

was a sentence of 21 years and 10 months' imprisonment.  Ford's
designation as a career offender was based on solid footing –
three predicate felony convictions in which Ford was represented
by counsel.  Ford has not identified any legal or factual basis
for arguing that Ford was not a career offender and government
counsel cannot discern any such arguments that could have been
made.  Indeed, Ford has not made any specific argument in support
of his conclusory claim that Lewis did not argue his criminal
history "correctly" and that she did not file "proper objections"
to the PSR.

Attorney Lewis did argue that the career-offender
designation overstated the level of Ford's criminality and that
he should not be considered a true career offender.  She was
successful in this strategy as the Court "eliminated" the concept
of career offender from the case.  The Court sentenced Ford under
the otherwise applicable drug guidelines.

Attorney Lewis also argued that Ford should not be held
responsible for anything other than the quantity of crack cocaine
(347.7 grams) which Ford distributed on the day of his arrest.
Again, Lewis was successful in this strategy as the Court
attributed only that amount to Ford, thereby reducing Ford's BOL
from 36 to 34.

Ford had 13 criminal history points and fell within CHC VI.
There was simply nothing that Lewis could do about that since

14

this category was based on Ford's prior sentences of
incarceration, the fact that Ford committed the federal offenses
while he was under a state sentence, and the fact that he
committed the federal offenses less than two years after his
release from state custody.  Ford has not pointed to any specific
factual or legal argument that Lewis could have made to reduce
his CHC.  Nor did he fault the Court on direct appeal for
selecting this category.  Lewis nevertheless did stress to the
Court that Ford's prior convictions were relatively minor.  The
government believes that this argument resonated with the Court
in view of the sentence ultimately imposed.

     Based on Attorney Lewis's representation, the Court reduced
the applicable GSR from 262-327 months to 188-235 months.  Since
the government was recommending a reduction of 30% from the low
end, the Court was well within its discretion to impose a
sentence of 131 months.  [ST 22].  Lewis further argued, however,
that the Court should depart even further, relying in part on the
novel theory that the Court should take into account the case
agent's opinion as to an appropriate sentence.  The case agent
opined that Ford deserved "no more than ten years." [ST: 22].
Again, Lewis was successful as the Court accepted the case
agent's view and imposed a sentence of 120 months.

     It is clear from the above record evidence that Lewis was
not consitutionally deficient in her representation of Ford at

15

sentencing.  Her efforts persuaded the Court to eliminate the
career-offender designation, to reduce the offense level
applicable to Ford, and to impose a sentence substantially below
that recommended by the government.  Indeed, Lewis was
extraordinarily effective in her performance.

> Ford Was Not Prejudiced By Lewis' Performance

Even assuming *arguendo* that Attorney Lewis was ineffective,
her performance did not prejudice Ford.  Ford walked into the
sentencing hearing facing a sentence of at least 262 months'
imprisonment.  He walked out of the hearing with a sentence of
120 months' imprisonment, a reduction of almost 12 years.  Ford
has failed to meet his burden of demonstrating that Lewis's
performance undermined the fairness or integrity of that result.
To put it another way, Ford has not demonstrated that, but for
the unstated and unidentified errors made by Lewis, his sentence
would have been lower.  Ford has said absolutely nothing about
how he could have achieved a sentence below the 10-year minimum
mandatory.

**III. Ford's Claim Under Booker Is Not Cognizable In A Section
2255 Proceeding.**

Ford claims that <u>Booker</u> gives him a right to be resentenced
because he was "subject to a harsher standard of sentencing" and
because this Court could not consider certain factors that were
"forbidden" under the mandatory guideline system.  Ford has not
pointed out any such "factors" about himself or his situation that

16

would have resulted in a lower sentence.  Apart from that, the
First Circuit has ruled that claims such as this are not cognizable
in a § 2255 proceeding, i.e., that <u>Booker</u> is not applicable
retroactively to cases that were final prior to the <u>Booker</u> decision
in January 2005.[5]  <u>Cirilo-Munoz v. United States</u>, 404 F.3d 527,
532-33 (1st Cir. 2005).[6]  Every other circuit court of appeals has
ruled in the same fashion.  <i>E.g.,</i> <u>Never Misses A Shot v. United
States</u>, 413 F.3d 781, 783-84 (8th Cir. 2005) (per curiam)(collecting
cases); <u>Guzman v. United States</u>, 404 F.3d 139, 141-44 (2nd Cir.
2005).

    In <u>Booker</u>, the Court explicitly made its holding applicable to
all cases pending on direct review, 125 S.Ct. at 769, but made no
explicit statement of retroactivity to collateral cases.  As the
First Circuit has observed, "[o]nly in limited circumstances do new
rules apply to convictions that have already become final."
<u>Cirilo-Munoz</u>, 404 F.3d at 532.  Under the analysis enunciated by
the Supreme Court in <u>Teague v. Lane</u>, 489 U.S. 288, 109 S.Ct. 1060
(1989)(plurality opinion), a new rule of constitutional law does not
apply retroactively to cases on collateral review unless the rule
is substantive or a "watershed" rule of procedure "implicating the

_____

[5]As set forth above, Ford's criminal case became final in
March 2004 when the Court of Appeals summarily affirmed the
Judgment.

[6]<i>See also</i> <u>Sepulveda v. United States</u>, 330 F.3d 55, 61-63 (1st
Cir. 2003)(holding that the Supreme Court's decision in <i>Apprendi</i>
would not apply retroactively).

fundamental fairness and accuracy of the criminal proceeding." <u>Schriro v. Summerlin</u>, ___ U.S. ___, 124 S.Ct. 2519, 2522-23 (2004). As the First Circuit and other courts have ruled, <u>Booker</u> did not establish a substantive rule. <u>Cirilo-Munoz</u>, 404 F.3d at 532; <u>Guzman</u>, 404 F.3d at 142. Nor did it establish a watershed rule of procedure since the only change was the degree of flexibility that judges have in applying the guidelines and since judge-made findings at sentencing do not undermine "accuracy" or "fundamental fairness" at sentencing. <u>Cirilo-Munoz</u>, 404 F.3d at 532-33; <u>Guzman</u>, 404 F.3d at142-43. *See also* <u>McReynolds v. United States</u>, 397 F.3d 479, 481 (7th Cir. 2005). Accordingly, Ford's claim is not cognizable in a § 2255 petition.

**IV.  Ford's Claim That The Court Should Hold His Motion In Abeyance For Any Future Claims Should Be Rejected.**

Ford also asserts that the Court should hold his motion in abeyance so that he can continue to assert any claims that may arise in the future. The Court should reject this claim summarily because it is contrary to the gatekeeping requirements set up by Congress for habeas petitions. Under those requirements, a petitioner such as Ford has one year after his criminal case becomes final, or one year after certain other specific events occur, to file his petition. § 2255, ¶6. A petitioner must obtain the permission of the court of appeals to raise new claims by means of a second or subsequent

petition. § 2255, ¶8; 28 U.S.C. § 2244.  These gatekeeping requirements serve the important goal of promoting finality in criminal cases.

Ford's contention that his motion should be held "in abeyance" so that he can raise new claims *ad infinitum* is contrary to, and violative of, the requirements carefully laid out by Congress.  No court has allowed such latitude to a § 2255 petitioner.  Accordingly, this Court should reject Ford's claim.

Ford's argument also should be deemed waived since Ford provides absolutely no support for it.  As recognized in Dimarco-Zappa v. Cabanillas, 238 F.3d 25 (1st Cir. 2001), "simply noting an argument in passing without explanation is insufficient to avoid waiver."  238 F.3d at 34 (*quoting* McCoy v. Massachusetts Institute of Technology, 950 F.2d 13, 22 (1st Cir. 1991)).  "A party must provide analysis...or present legal authority directly supporting their thesis."  Id.

By merely mentioning Brackett and asking the Court to take into consideration any and all unknown future claims Ford might have from emerging cases, Ford offers no support for his claim, which is "the merest of skeletons."  McCoy, 950 F.2d at 22.  Since Ford has offered no support or analysis for his claim, this ground should be deemed waived.

**CONCLUSION**

19

Based on the foregoing, the government respectfully requests that the Court dismiss Ford's 18 U.S.C. §2255 motion without conducting an evidentiary hearing.

                                        Respectfully submitted,

                                        MICHAEL J. SULLIVAN
                                        United States Attorney


                              By:    /s/Michael J. Pelgro
                                     Michael J. Pelgro
                                     Assistant U.S. Attorney

DATED:    August 18, 2005.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

              Omay Ford
              Inmate No. 23785-038
              FMC Devens
              P.O. Box 879
              Ayer, MA 01432


This 18th day of August 2005.


                                     /s/Michael J. Pelgro
                                    MICHAEL J. PELGRO
                                    ASSISTANT UNITED STATES ATTORNEY


20

1           UNITED STATES DISTRICT COURT
            DISTRICT OF MASSACHUSETTS
2
    * * * * * * * * * * * * * * *
3   UNITED STATES OF AMERICA      *
                                  *
4              vs.                *        CRIMINAL ACTION
                                  *        No. 01-10351-JLT
5   OMAY FORD                     *
                                  *
6   * * * * * * * * * * * * * * *

7           BEFORE THE HONORABLE JOSEPH L. TAURO
            UNITED STATES DISTRICT JUDGE
8                   **CHANGE OF PLEA**

9   A P P E A R A N C E S

10          OFFICE OF THE UNITED STATES ATTORNEY
            1 Courthouse Way, Suite 9200
11          Boston, Massachusetts 02210
            for the United States
12          By:  Dickens Mathieu, AUSA

13
            LAW OFFICE OF LOIS LEWIS
14          74 Fuller Terrace
            West Newton, Massachusetts 02465
15          for the defendant
            By:  Lois Lewis, Esq.

16

17

18                              Courtroom No. 20
                                John J. Moakley Courthouse
19                              1 Courthouse Way
                                Boston, Massachusetts 02210
20                              January 24, 2002
                                12: 00 p.m.
21

22
                    CAROL LYNN SCOTT, CSR, RMR
23                    Official Court Reporter
                  One Courthouse Way, Suite 7204
24                 Boston, Massachusetts 02210
                        (617) 330-1377
25
                          Exhibit A

P R O C E E D I N G S

1

2          THE CLERK:  This is criminal matter No.

3     01-10351, United States of America versus Omay Ford.  Would

4     counsel please identify themselves for the record.

5          MR. MATHIEU:  Dickens Mathieu for the United

6     States, Your Honor.

7          MS. LEWIS:  Lois Lewis for Omay Ford.

8          THE COURT:  Okay.  Is your client prepared to

9     have me make inquiry of him, Ms. Lewis?

10          MS. LEWIS:  Yes, he is, Your Honor.

11          THE COURT:  Okay.  Mr. Ford, I am going to go

12     over a number of matters with you.  I am going to ask you

13     several questions, tell you several things.  If you don't

14     understand anything I have to say, please let me know and I

15     will try to make myself clearer.

16          Do you understand that?

17          MR. FORD:  Yes, sir.

18          THE COURT:  And if you want to stop at any

19     time and talk to your lawyer, let me know that and I will

20     permit you to do so.

21          Okay?

22          MR. FORD:  Okay.

23          THE COURT:  The first thing I want to make

24     sure of is that you know what you are being charged with.

25     And the accusations against you in these two counts are that

1   you conspired to possess with intent to distribute a product

2   known as cocaine base.  Do you understand that?

3                    MR. FORD:  Yes, sir.

4                    THE COURT:  And Count 2 charges you with the

5   actual distribution of cocaine base and aiding and abetting

6   in that distribution.  Do you understand that?

7                    MR. FORD:  Yes, sir.

8                    THE COURT:  And with respect to Counts 1 and

9   2, you face the possibility of a life imprisonment.  Do you

10  understand that?

11                   MR. FORD:  Yes.

12                   THE COURT:  And a four million dollar fine; do

13  you understand that?

14                   MR. FORD:  Yes.

15                   THE COURT:  And if you are sent to jail, you

16  are also facing the possibility of what we call supervised

17  release, which means that you may be under the supervision

18  of the Probation Department for a period of up to five years

19  after you are released from jail.  Do you understand that?

20                   MR. FORD:  Yes, sir.

21                   THE COURT:  Now, I also want you to understand

22  that you have many rights under our Constitution.  One of

23  the most important is your right under the Fifth Amendment

24  not to incriminate yourself.  And what this means is that no

25  one can force you to speak, no police officer, no

1   prosecutor, no judge, no one can force you to speak and then

2   use your words against you in a way that causes you some

3   punishment, whether that be a jail term, a fine or even

4   probation.

5          In other words, you have the right to remain silent

6   rather than speak and then find that your words were used

7   against you in that fashion.  Do you understand that?

8                    MR. FORD:  Yes, sir.

9                    THE COURT:  And I want you to appreciate that

10  if you plead guilty here this afternoon, that you are

11  waiving that important constitutional protection because

12  when you say the word "guilty," you are exposing yourself to

13  the possibility of substantial punishment.  Do you

14  understand that?

15                   MR. FORD:  Yes, sir.

16                   THE COURT:  And I also want you to understand

17  that you are accused of having committed this or these

18  crimes but you are presumed to be innocent.  And what this

19  means is that you don't have to come to court prepared to

20  convince anybody that you were not involved in this cocaine

21  base venture.  To the contrary, the government has to come

22  to court with sufficient evidence that would satisfy a jury

23  of twelve people of your guilt beyond a reasonable doubt,

24  which means to a certainty.

25         In other words, the government has a very heavy

1    burden of proof in a case such as this.  And you have no

2    burden of proof.  You can sit back and rely on the failure

3    of the government to convince a jury unanimously of your

4    guilt beyond a reasonable doubt.

5              Do you understand that?

6                   MR. FORD:  Yes, sir.

7                   THE COURT:  And, of course, for the government

8    to meet its responsibility and its burden of proof, there

9    would, of course, have to be a trial here in open court.

10   You would be represented by counsel at that trial.  Your

11   lawyer could do a variety of things to inject some doubt in

12   the jury's mind, even though you have no burden of

13   participating in the trial actively.

14             But your lawyer could present evidence on your

15   behalf, cross-examine government witnesses.  You could if

16   you wanted to take the witness stand yourself and tell your

17   own side of the story.

18             And these are among the many opportunities that

19   attach to a trial.  And I want you to appreciate that if you

20   plead guilty that these opportunities will be lost to you

21   forever.  If you plead guilty, there will be no trial.  The

22   only thing that will remain in the case is for me to

23   sentence you.  Do you understand that?

24                   MR. FORD:  Yes, sir.

25                   THE COURT:  And I may ask you some questions

1    about these offenses if you do plead guilty, if I do accept

2    the plea, and if I do, your answers to me must be truthful.

3    Otherwise you will be facing the possibility of being

4    accused of having committed perjury or having made a false

5    statement to the Court.

6            In other words, if I ask you some questions, you

7    have to give me a straight answer.  Do you understand?

8                    MR. FORD:  Yes, sir.

9                    THE COURT:  And I have here a letter dated

10    January 14 to Ms. Lewis from the Department of Justice,

11    which I take it, among other things, sets forth your

12    understanding as to what sentence recommendation the

13    government would make in your case.

14            And I want to make sure that you understand that I

15    am not bound by anything in that letter, that you face the

16    maximum as I have already outlined it to you.  Do you

17    understand that?

18                    MR. FORD:  Yes, sir.

19                    THE COURT:  Have you had anything to eat or

20    drink today that might in any way affect your ability to

21    think normally?

22                    MR. FORD:  No, sir.

23                    THE COURT:  Any medication?

24                    MR. FORD:  No.

25                    THE COURT:  Pills?  Anything like that?

1          MR. FORD:  No.

2          THE COURT:  Liquor?  Anything?

3          MR. FORD:  No.

4          THE COURT:  Do you feel as though you know

5    what you are doing?

6          MR. FORD:  Yes.

7          THE COURT:  Okay.  Take the plea.

8          THE CLERK:  Mr. Ford, as to Count 1 of this

9    indictment charging you with conspiracy to possess with

10   intent to distribute cocaine base, in violation of 21 United

11   States Code, Section 846, how do you plead to Count 1?

12         MR. FORD:  Guilty.

13         THE CLERK:  As to Count 2 of this indictment

14   charging you with distribution of cocaine base in violation

15   of 21 United States Code, Section 841(a)(1), and aiding and

16   abetting in violation of 18 United States Code, Section 2,

17   how do you plead to Count 2?

18         MR. FORD:  Guilty.

19         THE CLERK:  Thank you.

20         THE COURT:  Has anybody threatened you in any

21   way to get you to plead guilty?

22         MR. FORD:  No, sir.

23         THE COURT:  Any promises made to you to get

24   you to plead guilty?

25         MR. FORD:  No, sir.

1    **THE COURT:**  Counsel, on the basis of your

2    pretrial preparation do you know any reason why your client

3    should not plead guilty?

4    **MS. LEWIS:**  No, I do not, Your Honor.

5    **THE COURT:**  Okay.  Let's have a brief basis in

6    fact.  You may all be seated.

7    **MR. MATHIEU:**  Briefly, Your Honor, the

8    defendant was arrested on July 12, 2001 after he was

9    observed engaging in a hand-to-hand transaction with his

10   codefendant Curtis Strickland.

11   The object of that transaction later turned out to

12   be approximately 347 grams of cocaine base.

13   Prior to the defendant being arrested, the DEA,

14   which had been investigating Curtis Strickland for

15   approximately six months on an undercover basis, they

16   arrested Curtis Strickland and Curtis Strickland identified

17   the defendant as his source of the crack cocaine that the

18   DEA had been buying from Strickland for the previous six

19   months.

20   The defendant was then placed under arrest after

21   having been stopped by the Boston Police Department.  And

22   Curtis Strickland was brought in and he gave a proffer.  And

23   he would have testified at trial that the defendant was his

24   source of supply for crack cocaine.

25   That would be the sum and substance of the

1    government's evidence at trial.

2            THE COURT:  Okay.  I am satisfied that the

3    defendant understands the nature of the accusation, the

4    accusations against him, that he understands the maximum

5    consequences of his guilty plea in terms of what sentence

6    could be imposed, that he has pleaded guilty voluntarily and

7    that there is a basis in fact for his having done so.

8            Sentencing when?

9            THE CLERK:  Sentencing will be April 24th,

10   ten a.m.

11           THE COURT:  Is that convenient for everybody?

12           MR. MATHIEU:  Yes, Your Honor.

13           MS. LEWIS:  Yes Your Honor.

14           THE COURT:  Okay.  Good.  Thank you.

15           (WHEREUPON, the proceedings were recessed at 12:10

16           p.m.)

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____

CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377

1
          UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS

2
  * * * * * * * * * * * * * * *

3
UNITED STATES OF AMERICA     *
                         *

4
       vs.          *     CRIMINAL ACTION
                         *     No. 01-10351-JLT

5
OMAY FORD               *
                         *

6
  * * * * * * * * * * * * * * *

7
        BEFORE THE HONORABLE JOSEPH L. TAURO
         UNITED STATES DISTRICT JUDGE

8
              **DISPOSITION**

9
A P P E A R A N C E S

10
        OFFICE OF THE UNITED STATES ATTORNEY
        1 Courthouse Way, Suite 9200

11
        Boston, Massachusetts 02210
        for the United States

12
        By:  Dickens Mathieu, AUSA

13

14
        LAW OFFICE OF LOIS LEWIS
        74 Fuller Terrace

15
        West Newton, Massachusetts 02465
        for the defendant

16
        By:  Lois Lewis, Esq.

17

18
                    Courtroom No. 20
                    John J. Moakley Courthouse

19
                    1 Courthouse Way
                    Boston, Massachusetts 02210

20
                    April 24, 2002
                    10:10 a.m.

21

22

23
        CAROL LYNN SCOTT, CSR, RMR
          Official Court Reporter
       One Courthouse Way, Suite 7204

24
        Boston, Massachusetts 02210
           (617) 330-1377

25
            Exhibit B

```
1              P R O C E E D I N G S

2              THE CLERK:  This is criminal matter No.

3    01-10351, the United States of America versus Omay Ford.

4              Would counsel please identify themselves for the

5    record.

6              MR. MATHIEU:  Dickens Mathieu for the United

7    States.

8              MS. LEWIS:  And Lois Lewis for the defendant

9    Omay Ford.

10             THE COURT:  All right.  Just give me one

11   second, please.

12             (Pause in proceedings.)

13             THE COURT:  Okay.  First, we are here for

14   disposition.  And the first item of business I think should

15   be the government's motion for a downward departure.

16             Any objection to that?

17             MS. LEWIS:  No, Your Honor.

18             THE COURT:  Okay.  So that is allowed.

19             (Pause in proceedings.)

20             THE COURT:  Now, do you have any quarrel with

21   the government's recommendation contained in its motion for

22   downward departure?  You have got motions for downward

23   departure that are really moot now.

24             MS. LEWIS:  Yes, Your Honor.  At the time my

25   memo and motions were filed I believed that there would be a
```

1    5K1 motion filed but I did not have it.

2                    THE COURT:  I understand.

3                    MS. LEWIS:  So I did my motion under Career

4    Offender --

5                    THE COURT:  I understand.

6                    MS. LEWIS:  -- as well as under the totality.

7                    THE COURT:  I understand.

8                    MS. LEWIS:  I would have a quarrel, of course,

9    with a fifteen-year recommendation, yes.  As to the filing

10    of the motion itself, no.  But as to fifteen years, yes.

11                    THE COURT:  The 180 months?

12                    MS. LEWIS:  Yes, that's correct.

13                    THE COURT:  Okay.  What recommendation do you

14    make?

15                    MS. LEWIS:  Well, I had hoped -- in my memo I

16    had submitted a recommendation of 36 months, Your Honor,

17    which is vastly different.  And I had asked for that as a

18    sentencing recommendation.

19                    THE COURT:  And what is the basis for that?

20                    MS. LEWIS:  Well, I think the basis lies in

21    the review of the criminal records, Your Honor, as well as

22    some of the particular characteristics of this offender.

23                    THE COURT:  You know, specifically what?

24                    MS. LEWIS:  Well, for instance, in the

25    presentence report or in the exhibit that is attached to the

1    government's memorandum, if you look at the offense in

2    Paragraph 29, I think generally speaking my objection is --

3    and then I'll speak to it specifically -- my general

4    objection is that the criminal record reflects the

5    individual who has a substance abuse problem.  And these

6    convictions primarily arise out of that substance abuse that

7    he has experienced.

8         And that he will, unless properly treated here --

9    and I have in my memo asked for the Comprehensive Drug

10   Treatment Program, the 500- Program during his incarceration

11   to address that problem, because I don't think it has been

12   even summarily addressed in any of the state courts.

13        My specific objection is in reference to many of

14   these motor vehicle violations that this is a concept which

15   I know has been referred to in this court by judges and in

16   the media as "driving while black" and I would ask the Court

17   to look at that as well.

18        But specifically I am looking at Paragraph 29 in

19   which he was given a two-year House of Correction sentence

20   which was suspended.

21        Now, many of these sentences in his criminal record

22   have either been suspended or there has been a very minor

23   term of incarceration imposed and on that there was two

24   years to the house and it was suspended.  And that was in,

25   the offense was in '93, I believe he was sentenced in '94.

1      And then when you go at Paragraph 30, you will see

2   that he was given for an offense in '94, he in '95 was

3   sentenced to two years in the House of Correction.  And I

4   would submit, Your Honor --

5           THE COURT:  You know, what I am focusing on

6   here is the cooperation.  In other words, the government

7   comes here -- and you would agree that but for this 5K1

8   motion, he would be looking at roughly 260 months --

9           MS. LEWIS:  Well, unless the Court were to

10  depart downward, yes, 262 to 327 would be the applicable

11  guideline range unless this Court departed downward on some

12  other, on a 41A3 or even downward on career offender, he

13  would be looking at that guideline range, yes, I would agree

14  with that.

15          THE COURT:  And you are saying that the record

16  overstates, I mean, the record overstates the impact?

17          MS. LEWIS:  I think so.

18          THE COURT:  What do you say about that?  In

19  other words, you come up with a fifty percent discount

20  so-to-speak; but the issue is where do you start?  What

21  makes him a career offender in the real sense?

22          MR. MATHIEU:  Your Honor, the Probation Office

23  has set forth in the PSR at least three qualifying

24  convictions.  There are two distribution --

25          THE COURT:  Where are we here?  What page?

1          MR. MATHIEU:  Page 7, Your Honor, Paragraph 29

2    represents the first identifiable qualifying conviction.

3    Then Paragraph 30 sets forth a second --

4          THE COURT:  Wait a minute.  29, 29 is

5    manufacturing a controlled substance?

6          MR. MATHIEU:  Yes, Your Honor.

7          THE COURT:  It was suspended.

8          MR. MATHIEU:  And then --

9          THE COURT:  How old was he then?

10          MR. MATHIEU:  He was 23, Your Honor.

11          THE COURT:  Okay.

12          MR. MATHIEU:  Then Paragraph 30 at age 24

13    there was a distribution in the school zone of Class B.

14          THE COURT:  This is 30?

15          MR. MATHIEU:  Yes, Your Honor.

16          THE COURT:  What was the substance?  What was

17    he --

18          MR. MATHIEU:  Class B, Your Honor, which is

19    cocaine.  And that was a substance from the 1993 conviction

20    as well.

21          THE COURT:  And 31, is that it?

22          MR. MATHIEU:  Yes, Your Honor, 31 for assault

23    and battery with a dangerous weapon.

24          THE COURT:  Now, if I felt that the record did

25    not add up to career criminal -- it is certainly not the

1    worst record I have ever seen that adds up to a career

2    criminal category -- what would be different about the

3    guidelines?

4            MR. MATHIEU:  If he were not deemed to be a

5    criminal?

6            THE COURT:  Yes.

7            MR. MATHIEU:  Your Honor, the defendant would

8    still be in criminal history category six because he has

9    thirteen criminal history points.  The amount of drugs

10   involved would be between 500 to 2,000 grams -- well, it

11   would be over fifty grams of crack which would place him in

12   criminal history category -- I'm sorry -- in base offense

13   level -- strike that -- because of --

14           THE COURT:  Make sure.  You know, I am not

15   asking you to be an advocate.  I want you to tell me what

16   you think so make sure you know, you have got your facts

17   straight.

18        Do you want a minute to check them out?

19           MR. MATHIEU:  Well, it will just take a

20   second, Your Honor.

21           THE COURT:  Yes.

22        What do you say?  If we eliminate career criminal.

23           THE PROBATION OFFICER:  If we eliminate career

24   criminal, Your Honor, his offense level would be 33 as

25   calculated in the guidelines.  His criminal history category

1    would still be a six.  His guideline range would then be 235

2    to 293 months on my calculations, Your Honor.

3                    THE COURT:  235?

4                    THE PROBATION OFFICER:  235 to 293.

5                    THE COURT:  What do you say about that?

6                    MS. LEWIS:  Well, if we take from his plea

7    agreement the admission of fifty grams of cocaine base, then

8    we would be looking at a level 32 prior to the acceptance of

9    responsibility because 32, level 32 is at least fifty grams

10   but less than one hundred fifty grams of cocaine base.

11            Now, if we start getting into relevant conduct

12   here, from the prior sales then --

13                    THE COURT:  The plea agreement takes it at

14   fifty?

15                    MS. LEWIS:  Yes.

16                    MR. MATHIEU:  The plea agreement states that's

17   it's at least fifty grams, Your Honor.  The relevant

18   conduct, with the relevant conduct is a finding of at least

19   500 grams.  And that would place the defendant in criminal

20   history category or a base offense level of 36.

21                    THE COURT:  Forget relevant conduct.  Was your

22   understanding with the defendant that he was going to plead

23   to fifty?

24                    MR. MATHIEU:  No, Your Honor.  His

25   understanding is that he would plead to at least fifty --

1          THE COURT:  What does it say?  Where is it?

2     Do I have it?

3          THE CLERK:  Yes, you do, Judge.

4          (Pause in proceedings.)

5          MR. MATHIEU:  Referring your attention to Page

6     2, Your Honor, Paragraph 3 of the plea agreement.

7          THE COURT:  Page 2, Paragraph 3.  Yes.

8          MR. MATHIEU:  And the second line or the third

9     line reads, "Counts 1 and 2 of the indictment involved fifty

10    grams or more of cocaine base, also called crack cocaine."

11         And so it was the contemplation of the parties that

12    there would be at least fifty grams attributable and that

13    the Probation Office would then determine the total amount

14    attributable to the defendant.

15         And in this instance the total amount is somewhere

16    between 501.54 grams of crack, which under 2D1.1 is an

17    offense level of 36.

18         THE COURT:  Okay.  What do you say now?  He

19    reads it accurately.

20         MS. LEWIS:  My understanding from the plea

21    agreement was that it would involve at least fifty grams of

22    the cocaine base and not to exceed one hundred fifty.

23         Now, when we start talking about relevant

24    conduct --

25         THE COURT:  Where does it say that?

1    MS. LEWIS:  It says in the plea agreement, I

2    am telling my interpretation was that Count 1 and 2 of the

3    indictment involved --

4    THE COURT:  Involved fifty or more.  It

5    doesn't -- where does it max out?

6    MS. LEWIS:  It doesn't max out here, Your

7    Honor.  But if one were to infer that fifty grams or more,

8    we're thinking in terms, at least I was of a level 32

9    because I was not dealing with relevant conduct at that

10   point.  And relevant conduct to me is in question in this

11   case.

12   And I did try to deal with that in my memo because

13   there were sales or transactions in December of 2000 and in

14   February of 2001 and in May of 2001 leading to the final

15   transaction when he was arrested.

16   And from the discovery material which I received,

17   Your Honor, and from the tapes and the available material, I

18   know my client was incarcerated in December of 2000 and had

19   been since March of 2000.  And Probation did agree that he

20   should not be accountable for that amount which is 26.7

21   grams, a fairly minor amount in terms of the others.

22   And that the only supporting statement to the

23   amount would be from the codefendant Curtis Strickland who

24   actually did these transactions with the government

25   operatives in his proffer session and that the cocaine base

1    was obtained from Omay Ford for the March and April.

2    Therefore, Probation held Omay Ford accountable for that

3    amount.  And that was revealed to me when I received the

4    amended Probation Report which I would have taken objection

5    to.

6         But apparently in one of the proffer sessions with

7    Mr. Strickland this is what he said.  And so I would raise

8    objection to that being counted as well as relevant conduct

9    because under the criteria to establish relevant conduct I

10   don't think that satisfies it.  That is my objection in

11   regard to that relevant conduct.

12        So I would hold him no more responsible than what

13   was at the actual July transaction was 347 grams, Your

14   Honor, which then would bring it into the next level of 34.

15        MR. MATHIEU:  Your Honor, the -- I think I

16   heard Ms. Lewis at least concede that there were two

17   transactions that the government told the Probation Office

18   that the defendant should not be held accountable for.

19   These were transactions in February -- December and

20   February, December of 2000 and February of 2001.

21        When you take those two transactions out of the

22   equation, the drug amount is still over 500 grams and so the

23   offense level is still 36.

24        THE COURT:  Well, not if I don't think that

25   the relevant conduct is established by the testimony of his

1    co-conspirator or codefendant.  I mean, that is the only

2    evidence that you have, what this guy said was going down.

3              MR. MATHIEU:  No, Your Honor, there --

4              THE COURT:  I mean, in addition to -- clearly

5    he is chargeable for what he was caught with at the time he

6    arrested.  That is how much?

7              MR. MATHIEU:  That was approximately

8    347 grams.

9              THE COURT:  All right.  Now, assuming that we

10    leave it at that, what are the Sentencing Guidelines?

11              MR. MATHIEU:  It would be 34, Your Honor.  But

12    just for the record, I believe that the standard is beyond a

13    preponderance with respect to the relevant conduct.

14              THE COURT:  I understand.

15              MR. MATHIEU:  And --

16              THE COURT:  But, I mean, I have to be

17    persuaded.

18              MR. MATHIEU:  Of course.

19              THE COURT:  So let's move ahead.

20        Assuming that I am not persuaded and that the --

21    what he is responsible for is what happened on the day that

22    he was busted, you say that is now 34.  Where does that

23    leave us in terms of the guidelines?

24              MR. MATHIEU:  That would -- with three for

25    acceptance of responsibility, that would take him to 31,

1  Your Honor, and he would be in criminal history category six

2  still.  He would be looking at 188 to 235.

3           THE COURT:  188 to 235?

4           MR. MATHIEU:  That's correct, Your Honor.

5           THE COURT:  Okay.  All right.  That is what I

6  am going to decide is the relevant range.

7           You have given -- you have made an assessment that

8  his cooperation is worth a fifty percent discount.

9           MR. MATHIEU:  I believe that the Office's

10  position is that it was worth thirty percent, Your Honor,

11  the low end of the guideline range.

12           THE COURT:  Is my math wrong?  Maybe it is.

13  It is not my strong suit.

14           The guideline range without anything is -- where is

15  that motion?

16           Is 262.

17           MR. MATHIEU:  And the Office's recommendation

18  was 180.

19           THE COURT:  180.  Am I wrong?  Isn't that just

20  roughly fifty percent of 262?

21           MR. MATHIEU:  No, Your Honor.  Fifty percent

22  would be about 130.

23           THE COURT:  You are right, you are right.

24  Excuse me.

25           Okay.  All right.  I am going to decide that the

1    guideline range should be -- what did we just say?

2                MR. MATHIEU:  188 to 235.

3                THE COURT:  Okay.  And then I am going to

4    accept your thirty percent downward departure

5    recommendation, which makes it what?

6                THE PROBATION OFFICER:  Approximately 135

7    months, Your Honor, if my math is correct.

8                THE COURT:  Okay.  Do you have any comment on

9    that?

10               MS. LEWIS:  Yes, Your Honor.

11               THE COURT:  Go ahead.

12               MS. LEWIS:  I am still asking the Court to go

13   lower than that, Your Honor.  And, I mean, you have a

14   complete motion in front of you as to the cooperation.  This

15   is a man who has done everything he could possibly do when

16   he was arrested.

17               I am also asking that the Court look at that

18   criminal record very seriously because I do believe that it

19   does not reflect that of someone who --

20               THE COURT:  I have already taken the career

21   criminal out of it.  You calculated the career criminal out

22   of that; haven't you?

23               MR. MATHIEU:  Your Honor, if the Court makes a

24   finding that the defendant is a career criminal --

25               THE COURT:  No, say it the other way.  In

1    other words, I have got a 5K from you so I can take it all

2    the way down to zero.

3                    MR. MATHIEU:  That's correct, Your Honor.

4                    THE COURT:  So I want to eliminate the career

5    criminal aspect of this because I don't think he is a

6    particularly strong career criminal.  It may get over the

7    crossbar but it just barely gets over it.

8            So if we eliminate that and we just establish the

9    amount of being what was involved on the day he was busted,

10   what are the guidelines then?

11                   MR. MATHIEU:  Your Honor --

12                   THE COURT:  Don't argue with me.  Just tell me

13   what they are.

14                   MR. MATHIEU:  I am not arguing.  I am just not

15   sure I understand the Court's point because the defendant

16   either is or is not a career criminal but --

17                   THE COURT:  I am making the calculation -- I

18   am trying to come up with a sentence.  And I am just

19   thinking it through, okay, so just answer my question.  If

20   he is not a career criminal, just assume that, if he is not

21   a career criminal, and assume what we were dealing with is

22   what was involved the day he was busted, what are the

23   Sentencing Guidelines?  Do you know the answer to that?

24                   MR. MATHIEU:  Yes, Your Honor.  What we are

25   looking at here, which would be a criminal history category

1    of six, approximately 347grams of cocaine base which places

2    him in a base offense level of 34, three off for acceptance,

3    now he's looking at a base offense level of 31 and he's

4    looking at a range of 188 to 235, which is what I thought

5    the Court had come to.

6                    THE COURT:  Is that --

7                    THE PROBATION OFFICER:  That is accurate, Your

8    Honor.

9                    THE COURT:  With the career criminal out of

10   the case?

11                   THE PROBATION OFFICER:  With the career

12   criminal out of the picture, that makes us go back to the

13   original guideline as opposed to the career offender base

14   offense level.

15                   THE COURT:  And that is the 180?

16                   THE PROBATION OFFICER:  And that is the 180 to

17   235 months.

18                   THE COURT:  Okay.

19                   MS. LEWIS:  I agree with that, Your Honor; but

20   I am asking the Court to go further downward.

21                   THE COURT:  I am not going to do that.  I am

22   not going to do that.

23                   MS. LEWIS:  Then if you are not going to do

24   that, there is nothing more I can say.

25                   THE COURT:  I understand.

1          MS. LEWIS:  I would ask the Court to consider

2    the severity of this felony is based on the fact that the

3    Court accepts it as crack cocaine and not cocaine base.  And

4    I think there will be some changes in the future in regard

5    to sentencing under that.  Whether that will affect this

6    particular defendant, only time will tell.

7          I also ask the Court to look at the individuals

8    that have pled guilty in this case, the ones that supplied

9    the cocaine powder to this defendant and that one of them

10   has pled guilty and is still on the street.  There is

11   tremendous disparity in terms of sentencing for cocaine base

12   and cocaine powder.

13         THE COURT:  I understand that.  That is a very

14   legitimate argument to make but it is one to make to the

15   Congress, you know, not to me.

16         MS. LEWIS:  I understand that, Your Honor, one

17   I think the Commission is going to be making in terms of

18   recommendations.

19         I have also spoken with the case agent in this

20   regard who is present here and I believe I can accurately

21   say that he felt that he shouldn't get anything -- that a

22   five-to-ten-year range would be appropriate in this

23   particular circumstance.  He is here.

24         His fiancée and his baby are here.  And the O'Neils

25   have made a trip down from Maine.  They're particularly

1   interested in this young man because they see the promise

2   with him.  And I think that we have someone here who has a

3   very definite record for drugs.  He needs a drug treatment

4   program which I'd ask for.  I'd ask for his placement at

5   Devons so he can be near his newborn.  His newborn was just

6   born the end of March, and to try to keep some family

7   semblance there.

8           I think I have made my request in the memo as clear

9   as I can for that regard.

10          THE COURT:  And I try to be responsive to your

11  request.

12          MS. LEWIS:  But I would ask --

13          THE COURT:  Okay.  We are going to sentence

14  now.

15          MS. LEWIS:  May the defendant address the

16  Court?

17          THE COURT:  Yes, I am going to ask him.

18          Mr. Ford, you are about to be sentenced.  As one

19  who faces sentencing, you have the right to address the

20  Court, tell me anything that may be on your mind if you care

21  to do so.  If you would prefer to remain silent, you may

22  remain silent without fear of being prejudiced.  If you want

23  to talk, go ahead.  If you don't, that's okay.

24          MR. FORD:  No, I'd like to address the Court.

25          First of all, I'd like to apologize to my family

1    and to the community for even being in this position.

2    Unfortunately I put myself here and I understand.

3           But if you would really look at the case and the

4    matter that's really going on here, sir, I was not an active

5    player in this conspiracy here.  I was asked if I knew

6    someone who had the coke.  I said I did.  I really didn't

7    want to mess with it because I just came out of jail.

8    Unfortunately I went through with the transaction.  As soon

9    as the transaction went down, I gave the government all that

10   I could.  Okay.  I accept my responsibility for that.

11          If you look at my record, sir, you would clearly

12   see that I am not a drug trafficker.  Two years I did

13   mandatory was for $20 worth of cocaine.

14          As the drug agent in the case will tell you, that

15   amount of time for me is just, is just a travesty, really

16   uncalled for because --

17              THE COURT:  Let me ask you:  Was the agent

18   involved in the determination as to the thirty percent?

19              MR. MATHIEU:  Your Honor, the process is

20   that --

21              THE COURT:  She's all right.  Don't worry

22   about the baby.  The baby is all right.

23              MR. MATHIEU:  The process is that the

24   Assistant makes a recommendation to the 5K1 Committee in our

25   office.

1       **THE COURT:**  The baby is all right.  You don't

2    have to -- the baby doesn't bother me.  Just sit down.

3       **MR. MATHIEU:**  The process is that the

4    Assistant on the case, in this case myself, makes the

5    recommendation to the 5K1 Committee and in making the

6    recommendation to the 5K1 Committee I did take the agent's

7    position into consideration and that factored into my

8    recommendation to the 5K1 Committee.

9       The 5K1 Committee --

10       **THE COURT:**  What was your recommendation?

11       **MR. MATHIEU:**  Your Honor, I'm not at liberty

12    to discuss that.  My position is what is set forth in the

13    government's motion for 5K1.  And so my recommendation is

14    what the committee recommends.

15       **THE COURT:**  Did he pass on the agent -- does

16    she correctly state what the agent's recommendation was?

17       **MR. MATHIEU:**  My discussion with the agent was

18    not that low, Your Honor.  I believe Ms. Lewis said that the

19    agent said five to, I think she said five to ten years.  And

20    I don't recall the agent ever saying anything below ten

21    years.

22       **THE COURT:**  He is here?

23       **MS. LEWIS:**  Yes, he is, Your Honor.

24       **THE COURT:**  Did you make a recommendation?

25       **THE AGENT:**  It's just my opinion.

1        THE COURT:  Yes, what was it?

2        THE AGENT:  It was five to ten years.  Not

3   more than ten years.

4        THE COURT:  And you passed that on that way?

5   Did you understand that to be the recommendation?

6        MR. MATHIEU:  I did not pass it on that way,

7   Your Honor.  I took the agent's recommendation to me into

8   consideration.

9        THE COURT:  No.  What I mean is as you took

10  his recommendation -- I understand you don't buy into it one

11  hundred percent.  But is that the way you -- you seem to

12  have some doubt in your mind as to what the recommendation

13  was.

14       He now has said five to ten.  Was that your

15  understanding when you passed everything onto the 5K

16  Committee?

17       MR. MATHIEU:  No, Your Honor.  My

18  understanding was that the agent had said somewhere around

19  ten years.

20       THE COURT:  You didn't know he said between

21  five to ten?

22       MR. MATHIEU:  I don't recall him ever saying

23  that to me.

24       THE COURT:  Did you tell him?  Did you tell

25  counsel that?

1    I can't see you.  You are standing in my way.

2         THE AGENT:  I'm sorry, Your Honor.

3    I forget what we discussed specifically.  But I

4    clearly remember saying he doesn't deserve more than ten

5    years.  I thought I said five to ten but I clearly remember

6    saying no more than ten years.  That's just my opinion.

7         THE COURT:  Now with this, we are dealing with

8    guidelines now of what again?

9         THE PROBATION OFFICER:  188 to 235 months,

10   Your Honor.

11        THE COURT:  188, and thirty percent of that

12   gave you what?

13        THE PROBATION OFFICER:  135.

14        THE CLERK:  131.5.

15        THE COURT:  Ten years would be 120, is that

16   it?

17        THE PROBATION OFFICER:  I'm sorry?

18        THE COURT:  Ten years would be 120?

19        THE PROBATION OFFICER:  Yes, Your Honor.

20        THE COURT:  Okay.  That is the sentence I am

21   going to impose, 120 months.  All right.

22        Is there anything else that should come to my

23   attention?

24        MS. LEWIS:  I'd just ask the defendant if he

25   had anything further to say.  I think we were in the midst

1    of him addressing the Court.

2                    THE COURT:  All right.  Did you have anything

3    else you want to say?

4                    THE DEFENDANT:  No, Your Honor.

5                    THE COURT:  All right.  Now, you have been

6    sentenced.  And as one who has been sentenced you have the

7    right to appeal that sentence.  If you don't have funds to

8    prosecute an appeal, then you can be permitted to proceed

9    without payment of any fee.  And if you don't have funds for

10   a lawyer, one will be provided for you.  Okay.

11                   MR. MATHIEU:  Your Honor -- I'm sorry.

12                   THE COURT:  Special assessment?

13                   THE PROBATION OFFICER:  Special assessment

14   $200, Your Honor.

15                   THE COURT:  A special assessment of $200.  And

16   supervised release?

17                   THE PROBATION OFFICER:  Five years.

18                   THE COURT:  Minimum?

19                   THE PROBATION OFFICER:  By statute.

20                   THE COURT:  All right.  Five years supervised

21   release.  No fine.

22                   MS. LEWIS:  Will the Court recommend placement

23   at Devons?

24                   THE COURT:  Yes.  And the 500-Hour Drug

25   Treatment.

1               **MS. LEWIS:**  Thank you, Your Honor.

2               **THE COURT:**  Anything else that should come to

3  my attention?

4               **THE PROBATION OFFICER:**  The Probation Office

5  just requests that drug treatment be imposed as a condition

6  of supervised release.

7               **THE COURT:**  Okay.  On an inpatient/outpatient

8  basis to be designated by the Chief Probation Officer.

9        Anything else?

10              **MR. MATHIEU:**  No, Your Honor.

11              **THE COURT:**  Okay.

12              **MS. LEWIS:**  No, Your Honor.

13              **THE COURT:**  All right.  That's it.  Thank you.

14

15

16        (WHEREUPON, the proceedings were recessed at 10:40

17        a.m.)

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Carol Lynn Scott, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

_____
CAROL LYNN SCOTT
Official Court Reporter
John J. Moakley Courthouse
1 Courthouse Way, Suite 7204
Boston, Massachusetts 02210
(617) 330-1377